XPO Logistics, Inc. v. Anis, 2016 NCBC 52.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

XPO LOGISTICS, INC.,

            Plaintiff,

    v.

FOUZI ANIS,

            Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 10677

)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION FOR
PRELIMINARY INJUNCTION**

{1}     THIS MATTER is before the Court on Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Motion"), made pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("Rules"). For the reasons explained below, Plaintiff's Motion is GRANTED.

*Robinson, Bradshaw & Hinson, P.A. by David C. Wright III, Douglas M. Jarrell, and Brian L. Church for Plaintiff.*

*Alston & Bird LLP by Mark T. Calloway and Michael R. Hoernlein for Defendant.*

Gale, Chief Judge.

## I.    INTRODUCTION

{2}     Plaintiff XPO Logistics, Inc. ("XPO") seeks to enjoin Defendant Fouzi Anis ("Anis"), XPO's former Director of Financial Planning and Analysis in XPO's supply chain division ("Supply Chain"), from pursuing employment with Syncreon America Inc. ("Syncreon") or its affiliates, and from otherwise using or disclosing XPO's trade secrets or confidential information. XPO seeks to enforce an employment agreement ("Employment Agreement") that includes restrictive covenants and that Anis signed following XPO's acquisition of Anis's initial

employer, Landstar Supply Chain Solutions ("LSCS"), a subsidiary of Landstar System, Inc. ("Landstar"), by stock merger.

{3}     Plaintiff's Motion presents a question of whether the Employment Agreement's attempts to restrict competition and disclosure of confidential information are supported by valid consideration. Where, as here, the agreement is consummated after the initiation of the employment relationship, a covenant against competition must be supported by consideration other than the promise of continued at-will employment. XPO contends, and Anis denies, that such consideration exists here based on either of two provisions in the Employment Agreement. First, the Employment Agreement provides that Anis would be entitled to severance payments if she is terminated without cause. Anis contends that the promise of such payments is illusory, because the possible severance payment is conditioned on her providing a release of claims that must be acceptable in XPO's sole discretion. Second, the Employment Agreement includes an arbitration clause that attempts to require any claims made by Anis to be submitted to arbitration in North Carolina. Anis contends that this provision was never intended as reciprocal consideration for the Employment Agreement, and that, in any event, the arbitration clause is so one-sided in favor of XPO that it cannot legitimately qualify as consideration for the covenant restricting Anis's right to compete with XPO.

{4}     The Court concludes that the promise for potential severance payments is not illusory and therefore provides consideration for the restrictive covenants that XPO seeks to enforce. The Court further concludes that it is unlikely that XPO will be able to prove that the arbitration provision provides consideration for the restrictive covenants. While Anis vigorously contests the validity of the covenant against competition, she has not yet challenged her obligation to honor the confidentiality obligations of the Employment Agreement or XPO's assertion that the information in her possession constitutes protectable trade secrets.

## II. PROCEDURAL BACKGROUND

{5}    XPO filed its Complaint on June 15, 2016, asserting claims for breach of contract, violation of the North Carolina Trade Secrets Protection Act, and conversion, and requesting issuance of a temporary restraining order and preliminary and permanent injunctive relief.

{6}    On June 17, 2016, after a hearing during which the parties presented evidence and legal arguments, Judge Robert T. Sumner granted XPO's motion for a temporary restraining order ("TRO") and entered a TRO prohibiting Anis from violating her noncompetition restriction and from using or disclosing XPO's trade secrets and confidential information.

{7}    On June 23, 2016, Chief Justice Mark Martin of the North Carolina Supreme Court designated this matter as a complex business case. On June 24, 2016, this Court issued a Consent Order Continuing Temporary Restraining Order, which provided that the TRO shall remain in effect until the Court rules on Plaintiff's Motion. The parties submitted briefs and other supporting material. The Court heard argument on Plaintiff's Motion on June 29, 2016. The parties requested that the Court refrain from ruling for a brief period to allow them to discuss the possibility of an agreed-upon resolution. On July 7, 2016, the parties advised that they could not reach agreement and that the Court should proceed with its determination. Plaintiff's Motion is ripe for ruling.

## III. FINDINGS OF FACT

{8}    The Court makes the following findings of fact solely for the purpose of ruling on Plaintiff's Motion, and without prejudice to the Court's ability to make contrary findings upon subsequent proceedings.

{9}    XPO is a Delaware corporation with offices in Charlotte, North Carolina, and its corporate headquarters in Greenwich, Connecticut. XPO is a global-transportation and third-party-logistics provider.

{10}    XPO's Supply Chain offers a variety of customized logistics solutions to its customers, including fulfillment, reverse logistics, factory support, manufacturing, packaging, transportation management, and supply-chain consulting.  XPO's services also include expedited shipping solutions for customers, which XPO has organized into three business functions: managed transportation, ground solutions, and air-charter solutions (the "Expedite Services").  Through its Supply Chain and Expedite Services divisions, XPO serves customers in multiple industries, including the automotive and technology industries.

{11}    Anis was initially employed by LSCS in June 2011 as LSCS's Director of Accounting and was located in Southfield, Michigan.  There is no evidence that Anis had any written employment agreement or covenant not to compete with LSCS or Landstar.  XPO acquired LSCS's stock in December 2013.  Anis remained employed by XPO until June 3, 2016.  Her most recent position with XPO was Director of Financial Planning and Analysis for Expedite Services, working within XPO's Supply Chain.

{12}    In early 2014, Anis executed the Employment Agreement in connection with her employment at XPO.  Section 17(a) of the Employment Agreement mandates that the agreement shall be governed by North Carolina law.

{13}    In the Employment Agreement, Anis promised not to use or disclose XPO's confidential information ("Confidential Information") except in the course of fulfilling her duties for XPO and to return all of XPO's Confidential Information and other property, including all electronically stored information, to XPO by the last day of her employment.

{14}    Section 7 of the Employment Agreement also contains a covenant against competition, which provides that, for a period of six months after termination of her employment, Anis would not provide services that are the same as, or reasonably related to, the services she performed during her last two years at XPO.  This covenant was limited to defined geographic areas and competing businesses.

{15} Section 7(e) of the Employment Agreement provides as follows:

> *Your Non-Compete Payments if We Terminate You Without Cause.* While the primary consideration for your grant of your Non-Compete to us is our employment of you, as additional consideration to you for your entering into this Agreement with us, if we terminate your employment *without* Cause (i.e., your employment termination was <u>not</u> on account of your quitting or the Company's terminating your employment for Cause), then we will make "***Non-Compete Payments***" to you, ratably over the six (6) month post-employment Restricted Period in accordance with our normal payroll policies, each in an amount calculated as set forth in subsection (i) below, upon the condition that you first furnish us with a written general release in a form acceptable to us in our sole discretion.

(Compl. Ex. 1 ¶ 7(e).)

{16} The Employment Agreement did not include a sample or proposed form of general release.

{17} Section 17 provides the method for resolving disputes that arise from the Employment Agreement. Section 17(b) obligates Anis to submit any claim that she wishes to initiate to arbitration in Charlotte, North Carolina. The Employment Agreement gives XPO the option of arbitrating or litigating disputes, in its sole discretion. If XPO chooses to litigate, Anis consents to jurisdiction in North Carolina and waives any right to a jury trial.

{18} In her role at XPO, Anis became privy to XPO's proprietary Confidential Information regarding Expedite Services and Supply Chain, including their financial performance, business strategy, pricing, contracts, and competitive offerings.

{19} Anis prepared monthly reviews of the business and its financial performance, which involved analyses of revenue, expenses, and profit margin, and comparisons of the business's performance to budget and prior-year performance. She also was involved with analyzing customers, determining pricing strategies and margins, preparing contract bids, completing business planning, budgeting, and evaluating strategic initiatives.

{20} Anis participated in Supply Chain's Monthly Operating Review ("MOR") meetings, during which management addressed the financial performance of Supply Chain's sites and business segments and reviewed Confidential Information regarding expenses, revenue, profit margins, capital expenditures, customer contracts and bids, budgets, forecasts, strategic initiatives, and competitor analyses.

{21} Anis participated in an MOR on May 25, 2016, two days before she handed in her resignation to XPO. During this meeting, Confidential Information about Supply Chain's financial performance was presented and discussed.

{22} Upon termination of her employment with XPO, Anis began working for Syncreon in a position similar to the financial planning and analysis role she held at XPO.

{23} Like XPO, Syncreon, offers supply-chain and third-party logistics-management services to customers in the automotive and technology industries. On its website, Syncreon states that it is a "leading provider of supply chain services to the global automotive industry" and that it "has served the premier technology brands for decades." (Compl. Ex. 2, at 2–3.)

{24} XPO and Syncreon are direct competitors. For example, Syncreon and XPO both recently bid on a contract to supply the management and distribution of computer and computer-related technology for a facility in Georgia.

{25} Before the TRO was issued, Anis was working in Syncreon's global headquarters in Auburn Hills, Michigan, less than thirty miles from the Southfield, Michigan, location where Anis worked for XPO. Syncreon's global headquarters is within the geographic restriction defined by the Employment Agreement.

{26} In her role with Syncreon, Anis will report directly to Syncreon's President and work with the company's executive team.

{27} In her final days of employment at XPO, including on her last day, Anis forwarded a number of XPO's e-mails and business files to her personal e-mail account, in violation of the terms of the Employment Agreement.

{28} The materials that she forwarded contain XPO's Confidential Information, such as information about XPO's financial data and performance; revenue, expenses, and profit; customers; business opportunities; budgeting; forecasting; status of projects; operational reports and initiatives; and strategic plans. Anis also forwarded to herself XPO's highly confidential Supply Chain pricing model and other information regarding Supply Chain's business, customers, and strategy. A competitor could use this information to its advantage and to XPO's detriment.

{29} Anis attempted to conceal her actions by deleting the e-mails from her "sent" folder and then deleting them again from her "deleted" folder. However, XPO was able to recover at least some of the e-mails through a forensic investigation of Anis's computer.

## IV. CONCLUSIONS OF LAW

{30} A preliminary injunction should issue

> only (1) if a plaintiff is able to show likelihood of success on the merits of [its] case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*NovaCare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 475, 528 S.E.2d 918, 920–21 (2000) (alteration in original) (quoting *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983)). The North Carolina Supreme Court has explained that, because the purpose of a preliminary injunction is to preserve the status quo, when the "principal relief sought is a permanent injunction, it is particularly necessary that the preliminary injunction issue." *A.E.P. Indus.*, 308 N.C. at 400, 408, 302 S.E.2d at 759, 763.

{31} The Court concludes that XPO has satisfied both prongs of the test: (1) XPO is likely to succeed on the merits of its claims for breach of the Employment

Agreement and misappropriation of trade secrets, and (2) XPO is threatened with real and immediate irreparable harm if the Court does not issue an injunction.

{32}   In North Carolina, a noncompetition covenant is valid and enforceable if it is (1) written; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer. *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994).

{33}   It is undisputed that the covenants in question are in writing and that they became a part of the Employment Agreement if they were supported by valid consideration. The Court's inquiry therefore focuses on whether the covenant was supported by valuable consideration, was reasonable as to time and territory, and was designed to protect XPO's legitimate business interest.

## A. The Covenant Not to Compete and the Nondisclosure Covenant Were Supported by Valuable Consideration.

{34}   Anis contends that, because she was employed with XPO when she signed the Employment Agreement, the promise of continued at-will employment cannot serve as consideration, and the promise not to compete therefore fails for lack of consideration. While it is correct that the mere continuation of Anis's employment could not serve as consideration for the agreement, the Court concludes that the covenants were supported by new, additional consideration.

{35}   Though North Carolina law is clear that an employer must provide an employee with new consideration for a covenant not to compete once the employment relationship has begun, *James C. Greene Co. v. Kelley*, 261 N.C. 166, 168, 134 S.E.2d 166, 167 (1964), it is equally well-established that it is not the Court's role to assess the adequacy of that consideration:

> Our Courts have not evaluated the *adequacy* of the consideration. Rather, the parties to a contract are the judges of the adequacy of the consideration. "The slightest consideration is sufficient to support the most onerous obligation, the inadequacy, . . . is

for the parties to consider at the time of making the agreement, and
not for the court when it is sought to be enforced."

*Hejl v. Hood, Hargett & Assocs., Inc.*, 196 N.C. App. 299, 305, 674 S.E.2d 425, 428–
29 (2009) (holding that five hundred dollars was sufficient consideration for an
agreement not to compete) (quoting *Catawba Valley Mach. Co. v. Aetna Ins. Co.*, 13
N.C. App. 85, 90–91, 185 S.E.2d 308, 311–12 (1971)). Nevertheless, a promise
offered as consideration for a reciprocal promise cannot be illusory. *See Milner
Airco, Inc. v. Morris*, 111 N.C. App. 866, 870, 433 S.E.2d 811, 814 (1993).

{36}    Without evaluating the adequacy of the consideration, North Carolina
courts have approved various forms of modest consideration, such as "continued
employment for a stipulated amount of time; a raise, bonus, or other change in
compensation; a promotion; additional training; uncertificated shares; or some other
increase in responsibility or number of hours worked." *Hejl*, 196 N.C. App. at 304,
674 S.E.2d at 428–29 (footnotes omitted). The court of appeals has held that one
hundred dollars was sufficient consideration to support a one-year noncompetition
restriction and a two-year nonsolicitation provision. *Emp't Staffing Grp., Inc. v.
Little*, __ N.C. App. __, 777 S.E.2d 309, 314 (2015) (affirming a preliminary-
injunction order).

{37}    The Court concludes that the provision in section 7(e) of the
Employment Agreement, which entitles Anis to receive severance payments equal
to three months' salary if XPO terminates her employment without cause (as
defined in the agreement), was adequate consideration for the covenant not to
compete. While the Court acknowledges that a reasoned argument could be made
that the burden of the reciprocal promises was substantially greater on Anis than
on XPO, the Court's inquiry does not extend to balancing those burdens.

{38}    Anis argues that the appropriate inquiry should not focus on the
respective value of the promises. Anis instead focuses on whether the promise of
potential severance benefits was illusory because XPO had sole discretion as to the
form of the release on which the severance was conditioned and could simply refuse

any payment and argue that its refusal was justified by the discretion provided by the Employment Agreement's terms.

{39} However, the Court concludes that XPO's exercise of that discretion is restricted by an obligation of good-faith performance, and that a court, if necessary, could enforce Anis's right to severance benefits if XPO, in bad faith, refused Anis's tender of a general release. *See Mezzanotte v. Freeland*, 20 N.C. App. 11, 17, 200 S.E.2d 410, 414 (1973). "Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play." *Id.*; *see also Dysart v. Cummings,* 181 N.C. App. 641, 647, 640 S.E.2d 832, 836 (2007); *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, No. 99 CVS 2459, 2003 NCBC LEXIS 5, at *28 n.3 (N.C. Super. Ct. Apr. 28, 2003) ("Provisions such as this one, which condition a party's contractual obligations to perform on an exercise of the party's discretion, are valid [and] a party must exercise its discretion under such a contractual provision both reasonably and in good faith.").

{40} The Court acknowledges that no North Carolina appellate decision to date has addressed the existence of a good-faith obligation within the context of a discretionary promise offered as consideration for a restrictive covenant in an employment agreement. But it does not necessarily follow that the general contract principles that allow the application of an obligation of good faith should not apply in the context of a promise not to compete simply because restrictive covenants are disfavored in North Carolina.

{41} In *Milner Airco, Inc. v. Morris*, the court of appeals found that an employer's promise for an employee "to become an account manager when the economy improved" was illusory. 111 N.C. App. at 869–70, 433 S.E.2d at 813. The Court concludes that the promise of the potential for severance benefits upon Anis's dismissal without cause is different from the promise in *Milner* and is not illusory. Whereas the employee in *Milner* was given hope of a position as a future manager based on an event that was uncertain and difficult to ascertain without an objective

standard, Anis was given the contractual right to a severance payment that XPO could avoid paying only upon its good-faith refusal to accept the general release Anis supplied pursuant to the terms of Employment Agreement. The Court concludes that XPO's promise was not illusory, and although the form of a release was yet to be determined, the clause regarding severance benefits is not an unenforceable "agreement to agree." *See Northington v. Michelotti*, 121 N.C. App. 180, 184–85, 464 S.E.2d 711, 714 (1995). The Court likewise believes that the Employment Agreement is distinguishable from one that provides only that an employee is potentially eligible for a future discretionary bonus. *See Amerigas Propane, L.P. v. Coffey*, No. 14 CVS 376, 2015 NCBC LEXIS 98, at *16–18 (N.C. Super. Ct. Oct. 15, 2015).

{42} Accordingly, the Court concludes that the undertakings of section 7(e) of the Employment Agreement constituted valuable consideration for the Employment Agreement's restrictive covenants.

{43} The Court concludes, however, that the arbitration provisions of section 17(b) were not in exchange for and did not provide valid consideration for the covenants at issue in this case. XPO argues that section 17(b) provides consideration for the covenant not to compete, because the requirement that any claim by Anis must be submitted to arbitration in North Carolina is a detriment to XPO, as XPO must submit to arbitration on those claims. For the arbitration provision to serve as consideration for Anis's promise not to compete, it must be evident that Anis sought XPO's promise to submit to binding arbitration in exchange for her promise not to compete. *See Chem. Realty Corp. v. Home Fed. Sav. & Loan Ass'n of Hollywood*, 84 N.C. App. 27, 31, 351 S.E.2d 786, 789 (1987). When reviewing the language used in the Employment Agreement and the situation of the parties at the time the Employment Agreement was executed, *see Cater v. Barker*, 172 N.C. App. 441, 445, 617 S.E.2d 113, 116–17 (2005), the Court determines that Anis did not seek XPO's promise to submit to binding arbitration in

exchange for her promise not to compete, and, as such, XPO's promise cannot serve as consideration for the restrictive covenant.

{44}    In conclusion, XPO has provided, at a minimum, the "slightest consideration" in exchange for the covenant not to compete and the confidentiality provision of the Employment Agreement. *Hejl*, 196 N.C. App. at 305, 674 S.E.2d at 429.

## B. The Restrictions in the Covenant Not to Compete are Reasonable as to Time and Territory.

{45}    In evaluating a covenant's reasonableness, geographic and temporal restrictions must be considered in tandem. *See Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 637, 568 S.E.2d 267, 272 (2002).  Thus, "in determining the overall reasonableness of the covenant not to compete[, a court can] evaluate the geographic restriction in light of the . . . duration of the time restriction." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 90, 638 S.E.2d 617, 620 (2007).

{46}    "A major consideration in determining the reasonableness of restrictions as to time and territory relates to the type of position occupied by the employee, and the skills and/or knowledge obtained by the employee," such that the employee's managerial position is a significant factor weighing in favor of the reasonableness of restrictions. *Manpower of Guilford Cty, Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979).

{47}    Anis has not challenged the geographic scope or temporal provisions of the covenants but the Court has considered their reasonableness in determining whether to issue a preliminary injunction.  Here, the covenant not to compete contains a three-tiered territory restriction.  The least restrictive of the defined territories, the territory within one hundred miles of XPO's principal office—at which Anis was employed—is reasonable, particularly in light of the short, six-month duration of the restriction.  North Carolina courts have consistently held even greater time and territory restrictions to be reasonable. *See, e.g., Okuma Am.*, 181 N.C. App. at 92, 638 S.E.2d at 622 (holding that a six-month restriction that

potentially encompassed both North and South America was not unenforceable as a matter of law); *Precision Walls*, 152 N.C. App. at 638, 568 S.E.2d at 273 (observing, in upholding a multistate restraint on a former manager, that a "one year time restriction is well within the established parameters for covenants not to compete"). The Court does not believe that the time restriction here is made unreasonable because of any look-back requirement. *See Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000) (noting that, when a noncompete reaches back to include an employer's clients during some period in the past, that period must be added to the restrictive period to determine the scope of the limitation); *cf. Inv'rs Tr. Co. v. Whitlock*, No. 14 CVS 1100, 2015 NCBC LEXIS 46, at *19–20 (N.C. Super. Ct. May 1, 2015) (discussing the parameters of a look-back period).

C. <u>XPO Has a Legitimate Business Interest in Protecting Its Confidential Information from Access by Its Competitors.</u>

{48} XPO's Confidential Information relates to XPO's performance, pricing, and business planning. The Court concludes that XPO has a legitimate business interest in protecting its Confidential Information from its competitors. *See, e.g., United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 650, 370 S.E.2d 375, 380 (1988) (protecting "valuable information as to the nature and character" of the business is a legitimate interest); *Precision Walls*, 152 N.C. App. at 639, 568 S.E.2d at 273 (holding that protection of "information and knowledge garnered from [former employee's] employment" is a legitimate business interest).

{49} Anis does not dispute that she is providing services to XPO's competitor, Syncreon, that are the same as, or reasonably related to, the services she performed for XPO, nor does Anis dispute that she copied XPO's information in connection with her termination.

**D. XPO Has Demonstrated a Likelihood of Success on the Merits on Its Claim for Misappropriation of Trade Secrets.**

{50} The North Carolina Trade Secrets Protection Act provides that "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action." N.C. Gen. Stat. § 66-154(a) (2015). To succeed on its claim for misappropriation of trade secrets, XPO must ultimately provide proof that it possessed trade secrets, and that Anis (1) knew or should have known of the trade secret, and (2) either had an opportunity to acquire the trade secret for disclosure or use, or has already acquired, disclosed, or used the trade secret without XPO's express or implied consent. *See id.* § 66-155.

{51} Anis does not deny that she sent to her personal account dozens of documents concerning XPO's business and financial information, or that those materials included XPO's Confidential Information. The Court concludes that XPO has adequately identified the information and has demonstrated a likelihood of success in proving that the information constitutes protectable trade secrets. The Confidential Information that Anis appropriated from XPO could be used by a competitor to compete unfairly against XPO the Confidential Information's disclosure is not enjoined.

## V.  CONCLUSION

{52} For the reasons explained above, the Court concludes that XPO is likely to succeed on the merits of its claim against Anis for breach of the Employment Agreement and that preliminary injunctive relief should issue. *See A.E.P. Indus.*, 308 N.C. at 406, 302 S.E.2d at 762 ("Plaintiff argues persuasively, and there is authority to support the argument that in a noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course; damage from the breach is presumed to be irreparable and the remedy at law is considered inadequate.").

{53} Further, Anis's removal of XPO's Confidential Information supports the issuance of a preliminary injunction. *See Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 570, 754 S.E.2d 852, 860 (2014) ("Defendant's knowledge of trade secrets and opportunity to use those in his work for his new employer create a threat of misappropriation, and thus the trial court's grant of a preliminary injunction during the pendency of the action was proper.").

{54} The Court, in the exercise of its discretion under Rule 65(c), determines that XPO should post a bond in the amount of $25,000.

{55} Based on the foregoing findings of fact and conclusions of law, Plaintiff's Motion is GRANTED, and the Court hereby ORDERS the following:

1. Anis is enjoined and restrained from violating the noncompetition covenant that is set forth in the Employment Agreement, attached as exhibit 1 to XPO's Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, for a period of six months, beginning on June 17, 2016.

2. Anis is enjoined from directly or indirectly using, disclosing, or copying the trade secrets and Confidential Information of XPO, as that term is defined in the Employment Agreement, or assisting any other person or entity to do so.

3. Except by agreement with XPO or further order of this Court, XPO and all persons with notice of this Order on Motion for Preliminary Injunction are prohibited from destroying, removing, transferring, or altering any documents or tangible things, including computer files and other electronic data, that constitute XPO's Confidential Information.

4. XPO shall post a bond in the amount of $25,000.

5. Under Rule 65(d), this Order on Motion for Preliminary Injunction shall be binding on the parties to this action, their officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive actual notice in any manner of the

Order on Motion for Preliminary Injunction by personal service or otherwise.

This the 12th day of July, 2016.

/s/ James L. Gale

James L. Gale
Chief Special Superior Court Judge
  for Complex Business Cases